**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE JAMES MADISON PROJECT, et
al.,

        Plaintiffs,

    v.

DEPARTMENT OF STATE, et al.,

        Defendants.

Case No. 1:17-cv-00027 (CKK)

**DECLARATION OF ANTOINETTE B. SHINER,
INFORMATION REVIEW OFFICER,
LITIGATION INFORMATION REVIEW OFFICE,
<u>CENTRAL INTELLIGENCE AGENCY</u>**

I, ANTOINETTE B. SHINER, hereby declare and state:

**I.  INTRODUCTION**

1.    I currently serve as the Information Review Officer ("IRO") for the Litigation Information Review Office at the Central Intelligence Agency ("CIA" or "Agency").  I assumed this position effective 19 January 2016.

2.    Prior to becoming the IRO for the Litigation Information Review Office, I served as the IRO for the Directorate of Support for over sixteen months.  In that capacity, I was responsible for making classification and release determinations for information originating within the

1

Directorate of Support.  Prior to serving in the Directorate of Support, I was the Deputy IRO for the Director's Area of the CIA for over three years.  In that role, I was responsible for making classification and release determinations for information originating within the Director's Area, which included, among other offices, the Office of the Director of the CIA, the Office of Congressional Affairs, the Office of Public Affairs, and the Office of General Counsel.  I have held other administrative and professional positions within the CIA since 1986, and have worked in the information review and release field since 2000.

3.    As the IRO for the Litigation Information Review Office, I am a senior CIA official and hold original classification authority at the TOP SECRET level under written delegation of authority pursuant to section 1.3(c) of Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), reprinted in 50 U.S.C. § 3161 note ("E.O. 13526").  As such, I am authorized to assess the current, proper classification of CIA information based on the classification criteria of E.O. 13526 and applicable CIA regulations.  Among other things, I am responsible for the classification review of CIA documents and information that may be the subject of court proceedings or public requests for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.

4.    Through the exercise of my official duties, I am familiar with this civil action and the underlying FOIA request submitted to the CIA.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.    The purpose of this declaration is to explain and justify, to the greatest extent possible on the public record, the CIA's actions in responding to the plaintiffs' FOIA request. For the Court's convenience, I have divided the remainder of this declaration into three parts.  Part II summarizes the plaintiffs' FOIA request and the CIA's response at the administrative stage; Part III will explain the CIA's determination that it can neither confirm nor deny the existence or nonexistence of the specific records sought in this case; and Part IV will discuss the application of FOIA exemptions to the plaintiffs' request.

## II.  PLAINTIFFS' FOIA REQUEST

6.    By letter dated 21 October 2016, the plaintiffs submitted a FOIA request to the CIA's Information and Privacy Coordinator seeking "copies of all Central Intelligence Agency ('CIA') records, including cross-references, memorializing communications between U.S. Government officials and officials from the Government of Ecuador concerning Julian Assange ('Mr. Assange')."  The letter stated that the "CIA can limit the

3

timeframe for this search from January 1, 2016, up until the date of acceptance of this request," and also clarified that the "scope of the search should not be limited to CIA-originated records and should be construed to include records that are currently in the possession of a U.S. Government contractor for purposes of records management."  A copy of the letter is attached to this declaration as Exhibit A.

7.    By letter dated 26 October 2016, the Information and Privacy Coordinator responded that the CIA could neither confirm nor deny the existence or nonexistence of records responsive to the plaintiffs' request, as the mere fact of the existence or nonexistence of the requested records was itself currently and properly classified and constituted intelligence sources and methods information protected from disclosure by Section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(1) of the National Security Act of 1947, as amended.  The letter also informed the plaintiffs of their right to appeal the Agency's response to the Agency Release Panel ("ARP") within 90 days of the date of the letter.  The plaintiffs' request was assigned the reference number F-2017-00115.  A copy of the letter is attached to this declaration as Exhibit B.

8.     By letter dated 8 November 2016, the plaintiffs appealed the Agency's "Glomar" response to the ARP.[1]  On 17 November 2016, the Agency acknowledged receiving the plaintiffs' appeal letter.  The Agency did not substantively respond to the plaintiffs' appeal prior to the filing of the Complaint with this Court on 5 January 2017.  A copy of the 8 November 2016 letter and the 17 November 2016 letter are attached to this declaration as Exhibits C and D respectively.

**III. THE CIA'S GLOMAR DETERMINATION**

9.     The CIA has invoked a Glomar response because confirming or denying the existence or nonexistence of the requested records would reveal a classified fact that is protected from disclosure by executive order and statute. Specifically, an official CIA acknowledgement that confirms or denies the existence or nonexistence of responsive CIA records would disclose whether or not the CIA had any involvement or an intelligence interest in purported discussions between the United States and the Government of Ecuador ("GOE") concerning Julian Assange, which would reveal classified information about the CIA's clandestine intelligence activities, sources, and methods.  Therefore, the CIA's only course of action is to

---

[1] The origins of the "Glomar" response trace back to the D.C. Circuit's decision in Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976), which affirmed CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning CIA's reported contacts with the media regarding Howard Hughes' ship, the "Hughes Glomar Explorer."

invoke a Glomar response by stating that it can neither confirm nor deny the existence or nonexistence of records that would be responsive to the plaintiffs' request.

10.   The CIA is charged with carrying out a number of important functions on behalf of the United States, which include, among other activities, collecting and analyzing foreign intelligence and counterintelligence.  A defining characteristic of the CIA's intelligence activities is that they are typically carried out through clandestine means, and therefore, they must remain secret in order to be effective.  In the context of FOIA, this means that the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information, including but not limited to, its sources, methods, interests, and activities.

11.   In a typical scenario, a FOIA requester submits a request to the CIA for information on a particular subject and the CIA conducts a search of non-exempt records and advises whether responsive records were located.  If records are located, the CIA produces non-exempt records or reasonably segregable non-exempt portions of records and withholds the remaining exempt records and exempt portions of records.  The CIA's response in this example – either to provide or not

provide the records sought – actually confirms the existence or nonexistence of CIA records related to the subject of the request.  Typically, this confirmation neither threatens the national security nor tends to reveal intelligence sources and methods because the mere fact that the CIA possesses or does not possess records is not itself a classified fact.

12.   In other cases, where the CIA located no responsive records reflecting an open or otherwise acknowledged connection to a subject or individual, the mere confirmation or denial of the existence of other responsive records would in itself reveal a classified fact:  namely, whether the CIA has an intelligence interest in a particular individual, subject, or activity.  In those cases, the CIA asserts a Glomar response because the existence or nonexistence of CIA records responsive to the request is a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security.

13.   To be credible and effective, the CIA must use the Glomar response consistently in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including in those cases in which the CIA does not possess any records responsive to a particular request.  If the CIA were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be

interpreted as an admission that responsive records exist.  This practice would reveal the very information that the CIA must protect in the interest of national security.

14.  After careful review, I have determined that if the CIA were to confirm the existence of the records requested by the plaintiffs, such confirmation would indicate the CIA's involvement or interest in alleged communications between the GOE and the United States government relating to Julian Assange. On the other hand, if the CIA were to respond by admitting that it did not possess any responsive records, it would indicate that the CIA had no involvement or interest in any such communications.  As will be explained in more detail in Section IV, either response would reveal sensitive information about the CIA's intelligence activities, interests, sources, or methods that is protected from disclosure by E.O. 13526 and statute. Therefore, the CIA must assert a Glomar response to the plaintiffs' request because the fact of the existence or nonexistence of CIA records responsive to this request is currently and properly classified and exempt from disclosure pursuant to FOIA Exemptions (b)(1) and (b)(3).

**IV. APPLICATION OF FOIA EXEMPTIONS**

**A. Exemption (b)(1)**

15.    Exemption (b)(1) provides that the FOIA does not require the production of records that are:  "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).

16.    Section 1.1(a) of E.O. 13526 provides that information may be originally classified under the terms of this order if the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in Section 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

17.    Furthermore, Section 3.6(a) of E.O. 13526 specifically states that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  Executive Order 13526 therefore explicitly authorizes the CIA's response to the

9

plaintiffs in this case.  As such, consistent with Sections 1.1(a) and 3.6(a) of E.O. 13526, and as described below, I have determined that the existence or nonexistence of the requested records is a currently and properly classified fact that concerns Sections 1.4(c) and (d) of the Executive Order, "intelligence activities, "intelligence sources and methods," and "foreign relations or foreign activities of the United States."  The "fact of" the existence or nonexistence of the records is information owned by and under the control of the United States government, and the unauthorized disclosure of information confirming or denying the existence or nonexistence of the requested records reasonably could be expected to result in damage to the national security.[2]

18.    In this case, acknowledging the existence or nonexistence of the requested records reasonably could be expected to cause damage to the national security by disclosing classified information about the scope and nature of the CIA's interactions and cooperation, if any, with a particular foreign government, intelligence activities and interests, sources, and methods.  Confirming or denying the existence or nonexistence of

---

[2] My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

the requested records would tend to reveal whether or not the CIA had any involvement in alleged discussions between the United States government and the GOE regarding Julian Assange or an intelligence interest in such discussions.

19.   The effective collection and analysis of intelligence requires the Agency to prevent the disclosure of information to our adversaries that would reveal details about the CIA's intelligence activities, sources, and methods.  The disclosure to our adversaries and potential intelligence targets of the areas and persons of CIA interest, or lack thereof, as well as the Agency's partnerships or interactions, or lack thereof, with specific foreign governments, would indicate to such organizations and individuals how the CIA is conducting and prioritizing its intelligence collection efforts and allocating its resources.  This would allow these individuals or organizations to arrange their counterintelligence and security resources in a manner most efficiently designed to frustrate the CIA's clandestine mission.

20.   If the CIA were to confirm whether or not it had records responsive to the plaintiffs' request, this would tend to reveal whether or not the CIA was involved in any alleged communications with the GOE.  The CIA's interactions and relationships with foreign governments are critical and extremely sensitive.  A "liaison relationship" is a cooperative

and secret relationship between the CIA and an entity of a foreign government.  Liaison relationships are working and information-sharing agreements between the CIA and other government entities or foreign intelligence services, initiated and continued on the basis of a mutual understanding that the existence and details of such liaison arrangements will be kept secret.  Exposing the existence of the relationship as well as details concerning the exchange of information can damage or destroy that information-sharing relationship.  Revealing a foreign government's clandestine relationship with the CIA could cause a public backlash that would exert pressure on the foreign government to halt cooperation with the CIA.  Moreover, if the CIA breaches the confidence and trust of a foreign liaison service, that service could limit the information it shares or restrict the level of its cooperation with the CIA or United States.  Even without a total breach of trust, disclosure of the relationship or sensitive intelligence information provided by a foreign government could lead to a decline in the quantity and quality of information received by the CIA.  A foreign service may also decide that the CIA cannot be trusted with certain types of sensitive intelligence.  Liaison services could make these types of decisions without ever informing the United States, simply by sharing and disseminating less information.

Such action could degrade the ability of the CIA to become aware of, and respond to, threats to the United States.

21.    In addition, if the CIA were to confirm that it had records responsive to the plaintiffs' request, our adversaries could use such a hypothetical revelation to, among other things, suggest that the CIA was meddling in the affairs of Ecuador by attempting to influence its policies with respect to Julian Assange.  That sort of acknowledgement could potentially affect our intelligence collection efforts throughout the region by encouraging individuals or entities hostile to the United States to strike back against the Agency or force our partners to scale back or eliminate their cooperation.

22.    Confirming the existence of responsive records could also potentially be used by non-state actors, such as Julian Assange and WikiLeaks, to bolster the narrative that the CIA and the United States intelligence community are actively targeting Assange for collection or working to secure his extradition to the United States.  Because WikiLeaks and Assange are the purveyors of allegedly stolen United States government information, and are well-known critics of the United States, any public acknowledgement that the CIA possesses records responsive to the plaintiffs' request would raise Assange's profile among his supporters and assist them in their efforts to obtain stolen information from disgruntled government employees

13

or partner with foreign intelligence services to damage the United States.[3]  In short, such confirmation would further the aims of WikiLeaks and Assange.

23.    Clandestine intelligence activities lie at the heart of the CIA's mission.  Terrorist organizations, foreign intelligence services, and other hostile groups use information regarding the CIA's specific intelligence activities and interests to thwart CIA operations and to attack the United States and its interests.  If the CIA were to reveal the existence or nonexistence of the records sought in this case, the CIA's adversaries would be able to use that information to identify the existence, scope, and nature of the CIA's intelligence interests, activities, sources, and methods, or lack thereof, as they relate to the co-conspirator of a hostile foreign intelligence service.[4]

---

[3] While the Director of the CIA recently described Julian Assange and WikiLeaks as a hostile non-state intelligence service often abetted by state actors like Russia, the CIA has never acknowledged whether or not it has been involved in any alleged communications with the GOE concerning Assange.

[4] In January 2017, the Office of the Director of National Intelligence released an Intelligence Community Assessment entitled "Assessing Russian Activities and Intentions in Recent US Elections."  The report was a declassified version of a highly classified assessment, but contained identical conclusions to those in the highly classified assessment.  The report assessed "with high confidence that Russian military intelligence (General Staff Main Intelligence Directorate or GRU) used the Guccifer 2.0 persona and DCLeaks.com to release US victim data obtained in cyber operations publicly and in exclusives to media outlets and relayed material to WikiLeaks."  The report also noted that "[t]he Kremlin's principal international propaganda outlet RT (formerly Russia Today) has actively collaborated with WikiLeaks.  RT's editor-in-chief visited WikiLeaks founder Julian Assange at the Ecuadorian Embassy in London in August 2013, where they discussed renewing his broadcast contract with RT, according to Russian and Western media.  Russian media subsequently announced that RT had become 'the

24.    For these reasons, I have determined that the existence or nonexistence of requested records is a properly classified fact that concerns intelligence activities, sources, methods, and foreign relations or foreign activities under Sections 1.4(c) and (d) of the Executive Order, and thus is exempt from disclosure under FOIA exemption (b)(1).

**B. Exemption (b)(3)**

25.    Exemption (b)(3) allows the withholding of information prohibited from disclosure by another federal statute, provided that such statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

26.    Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024 (the "National Security Act"), provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure."  Accordingly, the National Security Act has been widely recognized as a withholding statute under

---

only Russian media company' to partner with WikiLeaks and had received access to 'new leaks of secret information.'  RT routinely gives Assange sympathetic coverage and provides him a platform to denounce the United States."

Exemption (b)(3) in that it refers to particular types of matters to be withheld, and "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue."  5 U.S.C. § 552(b)(3).  Under the direction of the Director of National Intelligence pursuant to Section 102A, and consistent with Section 1.6(d) of E.O 12333, the Director of the CIA is authorized to protect CIA sources and methods from unauthorized disclosure.[5]  As demonstrated above, confirming or denying the existence or nonexistence of the requested records would tend to reveal information that concerns intelligence sources and methods.  Therefore, this information is exempt from disclosure pursuant to FOIA Exemption (b)(3) and the National Security Act.

27.    In contrast to E.O. 13526, the National Security Act does not require the CIA to identify and describe the damage to national security that reasonably could be expected to result should the CIA confirm or deny the existence or nonexistence of records sought by the plaintiffs.  Nonetheless, I refer the Court to the paragraphs above for a description of the damage to

---

[5] Section 1.6(d) of Executive Order 12333, as amended, 3 C.F.R. 200 (1981), *reprinted in* 50 U.S.C. 3001 note at 25(formerly codified at 50 U.S.C.A. § 401 note at 25 (West Supp. 2009)), and as amended by Executive Order 13470, 73 Fed. Reg. 45,323 (July 30, 2008) requires the Director of the Central Intelligence Agency to "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI][.]"

national security that is reasonably likely to accrue should the CIA provide anything other than a Glomar response in this case.

## V. CONCLUSION

28.    For all of the reasons described above, and after personal consideration of the matter, I have determined that the CIA can neither confirm nor deny the existence or nonexistence of the requested records because that fact is currently and properly classified and implicates intelligence activities, sources, methods, and foreign relations or foreign activities of the United States.    Accordingly, the "fact of" the existence or nonexistence of the records is properly withheld pursuant to FOIA Exemptions (b)(1) and (b)(3).


\*       \*       \*


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3ʳᵈ day of May 2017.



_____
ANTOINETTE B. SHINER
Information Review Officer
Litigation Information Review Office
Central Intelligence Agency

17

# EXHIBIT A

F-2017-00115

## The James Madison Project
### 1250 Connecticut Avenue, N.W.
### Suite 200
### Washington, D.C. 20010

(202) 498-0011
(202) 330-5610 fax

E-Mail: FOIA@JamesMadisonProject.org
http://www.JamesMadisonProject.org

October 21, 2016

OCT 2 1 2016

<u>VIA FACSIMILE</u>

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

Re:     <u>FOIA Request</u>

To whom it may concern:

This is a request on behalf of The James Madison Project ("JMP") and The Daily Beast reporter Shane Harris ("Mr. Harris")(jointly referred to as the "Requesters"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.* This FOIA request seeks copies of all Central Intelligence Agency ("CIA") records, including cross-references, memorializing communications between U.S. Government officials and officials from the Government of Ecuador concerning Julian Assange ("Mr. Assange").

Mr. Assange has been living in the Embassy of Ecuador in London since August 2012, having been approved for political asylum. *http://www.telegraph.co.uk/news/worldnews/ wikileaks/11681502/Why-is-Julian-Assange-still-inside-the-embassy-of-Ecuador.html* (last accessed October 20, 2016). WikiLeaks recently starting publishing on a daily basis copies of hacked e-mails from the private e-mail account of John Podesta, the Chairman of former Secretary of State Hillary Clinton's Presidential campaign. It has an estimated 50,000 total e-mails it will ultimately publish. *http://www.politico.com/live-blog-updates/2016/10/john-podesta-hillary-clinton-emails-wikileaks-000011* (last accessed October 20, 2016). On October 17, 2016, WikiLeaks confirmed that Ecuador had cut off Mr. Assange's internet access. *http://www. newser.com/story/232700/wikileaks-ecuador-cut-off-julian-assanges-internet.html* (last accessed October 20, 2016). State has denied that Secretary of State John Kerry or anyone else at the agency requested that Ecuador take such action against Mr. Assange. *http://thehill.com/policy/ cybersecurity/301527-state-dept-denies-kerry-asked-ecuador-to-halt-clinton-wikileaks-dumps* (last accessed October 20, 2016). However, news reports continue to indicate that the U.S. Government pressured the Government of Ecuador to cut off Mr.

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

The James Madison Project

Assange's access to the Internet. *http://www.nbcnews.com/news/us-news/u-s-urged-ecuador-act-against-assange-n669271* (last accessed October 20, 2016).

CIA can limit the timeframe for this search from January 1, 2016, up until the date of acceptance of this request. The scope of the search should not be limited to CIA-originated records and should be construed to include records that are currently in the possession of a U.S. Government contractor for purposes of records management.

The Requesters are pre-emptively waiving any objection to the redaction of the names of any U.S. Government officials below a GS-14 position or whom otherwise were not acting in a supervisory position. The Requesters similarly waive any objection to redactions of the names of any U.S. Government contractors in a position of authority similar to that of a GS-13 series civilian employee or below.

In terms of all other third parties who work for the U.S. Government and whose names appear in records responsive to this request, the Requesters submit that the privacy interests of those individuals have been diminished by virtue of their involvement in one or more of the U.S. Government functions described above as falling within the scope of this request. There is a recognized inverse relationship between the position of authority that a government employee holds and the strength of that employee's privacy interests. See Stern v. FBI, 737 F.2d 84, 92 (D.C. Cir. 1984); Jefferson v. Dep't of Justice, 2003 U.S. Dist. LEXIS 26782, *11 (D.D.C. Nov. 14, 2003); see also Perlman v. Dep't of Justice, 312 F.3d 100, 107-109 (2d. Cir. 2002)(setting forth five factors to consider in weighing government employee's privacy interests against public interest in disclosure, including employee's rank and whether information sheds light on a government activity).

The work performed by these third parties (whether they be Government officials or contractors) was part of their official responsibilities on behalf of the U.S. Government and was not of a personal nature. They served in a position of trust and authority to, among other things, convey to the Government of Ecuador the official U.S. Government position and views on the actions of Mr. Assange, particularly as it relates to potential foreign interference in the U.S. Presidential election. Responsive records memorializing the work they performed will shed light on government activity and detail the circumstances in which the U.S. Government sought to address the WikiLeaks' publications of Mr. Podesta's hacked e-mails. It would therefore be reasonable to conclude that the relevant third parties' respective (and diminished) privacy interests are outweighed by the public interest in disclosure of the information indexed to their name.

In terms of Mr. Assange, the Requesters respectfully submit that it borders on axiomatic the public interest in records responsive to this specific request outweigh his privacy interests.

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

The James Madison Project

Mr. Assange is an Australian national, a controversial public figure, and the Editor in Chief of WikiLeaks. His willingness to publish the hacked e-mails of Mr. Podesta, despite indications that they were provided to him by the Russian Government, see *https://motherboard.vice.com/read/how-hackers-broke-into-john-podesta-and-colin-powells-gmail-accounts?trk source=homepage-lede* (last accessed October 20, 2016), has led to accusations that he is directly or indirectly working on behalf of the Russian Government to influence the U.S. Presidential election. *http://www.cnn.com/2016/10/13/politics/russia-us-election/* (last accessed October 20, 2016).

Second, there is considerable public interest in disclosure of the responsive records themselves. The daily disclosure of Mr. Podesta's hacked e-mails by WikiLeaks has been criticized by Secretary Clinton's campaign as "Russian propaganda". *https://www.theguardian.com/us-news/2016/oct/11/clinton-campaign-wikileaks-hack-russia-donald-trump* (last accessed October 20, 2016). Secretary Clinton's campaign has accused WikiLeaks (and, by extension, the Russian Government) of attempting to use the e-mails to support her Republican opponent, Donald Trump. *http://www.chicagotribune.com/news/nationworld/politics/ct-hillary-clinton-hacked-emails-russia-20161012-story.html* (last accessed October 20, 2016).

Disclosure of records responsive to this request would detail the extent to which CIA communicated (if at all) with the Government of Ecuador to restrict the ability of Mr. Assange to coordinate additional leaks of Mr. Podesta's hacked e-mails. CIA's actions constitute basic and essential government activities and can reasonably be construed as outweighing any applicable categorical privacy interests enjoyed by Mr. Assange.[1]

For similar reasons, we are also requesting a waiver of or, at a minimum, a reduction in fees. First, both JMP and Mr. Harris qualify – in their own respective right – for designation as representatives of the news media.

JMP is a non-partisan organization dedicating to promoting government accountability and the reduction of secrecy. *http://jamesmadisonproject.org/* (last accessed October 20, 2016). Mr. Harris, for his part, currently serves as a Senior Correspondent for The Daily Beast[2] covering national security, intelligence and cyber security topics. He received the New York Public Library's Helen Bernstein Book Award for his book, The Watchers, and was the 2010 winner of the 2010 Gerald R. Ford Prize for Distinguished Reporting on National Defense. His most recent

---

[1] We acknowledge, of course, that some redactions or narrowly focused withholdings might ultimately be appropriate as CIA processes the responsive records.

[2] The Daily Beast, for its part, is a New York-based media outlet with an estimated 20 million readers per month. *http://www.thedailybeast.com/company/about-us.html* (last accessed October 20, 2016).

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

Case 1:17-cv-00027-CKK    Document 17-5    Filed 05/05/17    Page 22 of 32
2016-10-21 13:42:41 (GMT)                    12025584432 From: Bradley P. Moss

The James Madison Project
_____

book is entitled "@War: The rise of the Military-Internet Complex." *http://shaneharris.com/* (last accessed October 20, 2016).

The Requesters have the ability to disseminate information on a wide scale and intend to use information obtained through this FOIA request in an original work, particularly through news articles written by Mr. Harris and published by The Daily Beast. According to 5 U.S.C. § 552(a)(4)(A)(ii),

> the term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.

The Requesters can demonstrate their intent and ability to publish or otherwise disseminate information to the public. See Nat'l Security Archive v. Dep't of Defense, 880 F.2d 1381, 1386 (D.C. Cir. 1989). Mr. Harris in particular maintains the ability to publish articles explaining the content of any responsive records received as part of this request.

Finally, and again in reliance upon the same public interest reasons outlined above, the Requesters are seeking expedited processing of their FOIA request. FOIA permits expedited processing when a "compelling need" exists. 5 U.S.C. § 552(a)(6)(E)(v). Specifically, "compelling need" means "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." Id. at § 552(a)(6)(E)(v)(II).

The records responsive to this FOIA request clearly qualify as information regarding U.S. Government activity that the public has an urgent and active need to know. The U.S. Presidential election is less than three weeks away, and the ongoing daily publication of Mr. Podesta's hacked e-mails continues to influence the American public's view of one of the two major party candidates for the Presidency. Any efforts to curtail that publication, namely through communications to the Government of Ecuador, reflect on the seriousness with which the U.S. Government as a whole views the matter. This more than sufficiently satisfies the statutory requirement to demonstrate a "compelling need".

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify us of your appeal procedures available under the law. We request that any documents or records produced in response to this request be provided in electronic (soft-copy) form wherever possible. Acceptable formats are .pdf, .jpg, .gif, .tif. Please provide soft-copy records by email or on a CD if email is not feasible. However, the Requesters do not agree to pay an additional fee to receive records on a CD, and in the instance that such a fee is required, the Requesters will accept a

_____

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

Case 1:17-cv-00027-CKK    Document 17-5    Filed 05/05/17    Page 23 of 32
2016-10-21 13:42:41 (GMT)    12025584432 From: Bradley P. Moss

The James Madison Project

---

paper copy of responsive records. Do not incur any fees beyond $25 without securing authorization from Mr. Zaid or me.

CIA is required to respond to this request within 20 working days as provided for by law. However, CIA is required to issue a determination on the request for expedited processing "within 10 days after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I). Therefore, CIA's response is due on or before October 31, 2016. Failure to timely comply will result in the filing of a civil action against CIA in the United States District Court for the District of Columbia. Please note that a denial of expedited processing should not interfere with the normal processing of this request.

Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me at (202) 907-7945 or via e-mail at brad@jamesmadisonproject.org.

Sincerely,

/s/

Bradley P. Moss
Deputy Executive Director

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*



# FAX COVER SHEET

| | |
|---|---|
| TO | FOIAOffice |
| COMPANY | CIA |
| FAX NUMBER | 17036133007 |
| FROM | Bradley P. Moss |
| DATE | 2016-10-21 13:38:24 GMT |
| RE | FOIA request |

## COVER MESSAGE

Please find enclosed a FOIA request on behalf of The James Madison Project and Shane Harris.


Regards,


Brad Moss

# EXHIBIT B

Central Intelligence Agency



Washington, D.C. 20505

26 October 2016

Mr. Bradley P. Moss
Deputy Executive Director
The James Madison Project
1250 Connecticut Avenue, NW
Suite 200
Washington, DC  20010

Reference: F-2017-00115

Dear Mr. Moss:

This is a final response to your 21 October 2016 Freedom of Information Act
(FOIA) request, submitted on behalf of The James Madison Project and The Daily Beast,
received in the office of the Information and Privacy Coordinator on 21 October 2016, for
**copies of all Central Intelligence Agency ("CIA") records, including cross-references,
memorializing communications between U.S. Government officials and officials from
the Government of Ecuador concerning Julian Assange ("Mr. Assange").**  We have
assigned your request the reference number above.  Please use this number when
corresponding so that we can identify it easily.

In accordance with Section 3.6(a) of Executive Order 13526, the CIA can neither
confirm nor deny the existence or nonexistence of records responsive to your request.  The
fact of the existence or nonexistence of such records is itself currently and properly
classified and is intelligence sources and methods information protected from disclosure by
Section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(l) of the National
Security Act of 1947, as amended.  Therefore, your request is denied pursuant to FOIA
exemptions (b)(1) and (b)(3).  I have enclosed an explanation of these exemptions for your
reference and retention.  As the CIA Information and Privacy Coordinator, I am the CIA
official responsible for this determination.  You have the right to appeal this response to
the Agency Release Panel, in my care, within 90 days from the date of this letter.  Please
include the basis of your appeal.

If you have any questions regarding our response, you may contact us at:

Central Intelligence Agency
Washington, DC 20505
Information and Privacy Coordinator
703-613-3007 (Fax)

Please be advised that you may seek dispute resolution services from the CIA's FOIA Public Liaison or from the Office of Government Information Services (OGIS) of the National Archives and Records Administration. OGIS offers mediation services to help resolve disputes between FOIA requesters and Federal agencies. You may reach CIA's FOIA Public Liaison at:

703-613-1287 (FOIA Hotline)

The contact information for OGIS is:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
202-741-5770
877-864-6448
202-741-5769 (fax)
ogis@nara.gov

Contacting the CIA's FOIA Public Liaison or OGIS does not affect your right to pursue an administrative appeal.

Sincerely,

Michael Lavergne
Information and Privacy Coordinator

Enclosure

# EXHIBIT C

C06639770

# The James Madison Project
## 1250 Connecticut Avenue, N.W.
### Suite 200
### Washington, D.C. 20010

(202) 498-0011
(202) 330-5610 fax

E-Mail: FOIA@JamesMadisonProject.org
http://www.JamesMadisonProject.org

NOV 17 2016

November 8, 2016

VIA FACSIMILE

Agency Release Panel
Central Intelligence Agency
Washington, D.C. 20505
ATTN: Michael Lavergne, Information and Privacy Coordinator

RE: F-2017-00115

To whom it may concern:

   This constitutes a written appeal submitted on behalf The James Madison Project ("JMP")
and The Daily Beast reporter Shane Harris ("Mr. Harris")(jointly referred to as the
"Requesters"), and with respect to the above-identified FOIA request.

   By letter dated October 27, 2016, the Central Intelligence Agency informed the Requesters
that their FOIA request had been denied. This letter constitutes the formal appeal of that denial.

   Your cooperation in this matter would be appreciated.  If you wish to discuss this request,
please do not hesitate to contact me at (202) 907-7945 or via e-mail at
brad@jamesmadisonproject.org.

Sincerely,

Bradley P. Moss
Deputy Executive Director

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own
Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

**F**

USPS® FIRST-CLASS M

SHIP
TO:

WASHINGTON DC 20505

USPS CERTIFIED MAIL

9514 8000 0060 6313 0003

Sign: _____

Print: _____

Date: _____

BADGE #  _____

FROM  Bradley P. Moss, Esq.
Mark S. Zaid, P.C.
1250 Connecticut Avenue, NW
Suite 200
Washington, DC 20036

To

Agency Release Panel
Central Intelligence Agency
Washington, D.C. 20505
ATTN: Michael Lavergne
Information and Privacy Coordinator



# EXHIBIT D

Central Intelligence Agency



Washington, D.C. 20505

17 November 2016

Mr. Bradley P. Moss
Deputy Executive Director
The James Madison Project
1250 Connecticut Avenue, N.W.
Suite 200
Washington, DC 20010

Reference:  F-2017-00115

Dear Mr. Moss:

We received on 17 November 2016 your appeal to the Agency Release Panel from the response of the Information and Privacy Coordinator on your request under the Freedom of Information Act, which we processed under the case reference number above.

Please continue to use this case reference number so that we may more easily identify your administrative appeal.

Sincerely,

Michael Lavergne

Michael Lavergne
Executive Secretary
Agency Release Panel